[No. 1650.]

## PETER ROBERTI, RESPONDENT, *v.* J. P. ANDERSON, APPELLANT.

MASTER AND SERVANT—INJURIES TO SERVANT—CONFLICTING EVIDENCE—APPEAL—REVIEW.

1. A verdict for plaintiff on conflicting evidence will not be reversed if there is any credible evidence to support it.
2. In an action for injuries to a servant by reason of the viciousness of a horse furnished him by his master to use, evidence reviewed, and *held* sufficient to sustain a verdict for plaintiff.

FITZGERALD, J., dissenting.

APPEAL from the District Court of the Fourth Judicial District of the State of Nevada, Humboldt County; *S. J. Bonnifield, Jr.*, Judge.

Action by Peter Roberti against J. P. Anderson. From a judgment in favor of plaintiff, defendant appeals. **Affirmed.**

The facts sufficiently appear in the opinion.

*M. S. Bonnifield*, for Appellant:

I. The evidence herein cited shows that the plaintiff was in no manner deceived by the defendant with reference to the disposition of said horse and that the plaintiff voluntarily assumed the risk incident to the breaking of the young horse to a mower. Not only this, but his offer made to Ben Anderson and his declaration that he could work one of defendant's young horses above referred to, and that he had broken young horses for Snapp, which latter declaration he repeated, and the testimony of F. N. Muller, his own witness, to the effect that plaintiff was an experienced teamster and skilled in managing wild and dangerous broncos, show that he relied solely upon his experience and skill and not upon anything else that the defendant told him.

II. A recovery must be had, if at all, upon the facts alleged; the facts proved but not pleaded will not support the judgment. (11 Ency. Pl. & Pr. 869, notes 1, 2, citing numerous cases.) A recovery by the plaintiff must be based upon the facts alleged in the complaint. (Id. 889, note 1, cases cited.)

*Frank X. Murphy*, for Respondent:

I. Where the evidence is conflicting and there is some

evidence to support the verdict, a new trial ought not to be granted, and the verdict ought not to be disturbed. The questions of credibility of the witnesses, weight of evidence and amount of evidence are questions preëminently for the jury. (*Treadway* v. *Wilder*, 9 Nev. 71; *State* v. *Wong Fun*, 22 Nev. 336; *Sacramento M. & M. Co.* v. *Showers*, 6 Nev. 291; *State* v. *Yellow Jacket S. M. Co.*, 5 Nev. 415; *Barnes* v. *Western Union Tel. Co.*, 24 Nev. 125; *McGurn* v. *McInnis*, 24 Nev. 370; *McNamee* v. *Nesbitt*, 24 Nev. 400; *Crawford* v. *Crawford*, 24 Nev. 410; *Scott* v. *Haines*, 4 Nev. 426.) Surely there is some evidence to support the verdict in this case.

II. The objection to the complaint, that it does not state facts sufficient to constitute a cause of action, comes too late. No demurrer was filed to the complaint, and the defendant's answer cures any defects there may have been in the complaint. The action was tried upon its merits, a verdict rendered and judgment entered on the pleadings and the evidence. If negligence, which is a conclusion of law, or the ultimate fact, had been alleged in the complaint, it would have made no difference in the evidence introduced, for all the facts and circumstances surrounding the accident which caused the injury were fully gone into at the trial. The omission of the word "negligence," or any allegation of negligence, in the complaint did not affect the substantial rights of the defendant. The case was tried and determined on its merits alone. Under these facts and circumstances the judgment ought not to be reversed, affected or disturbed. (*McManus* v. *Ophir S. M. Co.*, 4 Nev. 15; *Lake Bigler Road* v. *Bedford*, 3 Nev. 399; *Cal. State Tel. Co.* v. *Patterson*, 1 Nev. 150; *State* v. *Lady Bryan M. Co.*, 4 Nev. 408; *Richardson* v. *Hoole*, 13 Nev. 492; *Treadway* v. *Wilder*, 8 Nev. 91; *Nix* v. *Miller*, 57 Pac. Rep. 1086, petition for rehearing.)

III. A complaint which states facts from which negligence can be inferred is not defective for omitting the word "negligent," or its derivatives, and the court would have been justified in overruling a general demurrer to the complaint, had one been filed. The sufficiency of the complaint, however, was not questioned. (*City of Geneva* v. *Burnett*, 91 N. W. 275; *Hirst* v. *Ringen Real Estate Co.*, 69 S. W. 368; *Scheiber* v. *United Tel. Co.*, 55 N. E. 742; *Romona Olitic*

*Stone Co.* v. *Johnson*, 33 N. E. 1000; *Ferguson* v. *V. & T. R. R. Co.*, 13 Nev. 190–194.)

IV.  The complaint is not required to contain express averment of defendant's negligence, but the allegation of facts showing a duty, a failure to perform it, and resulting injury, is sufficient.  (*Illinois Steel Co.* v. *Ostrowski*, 62 N. E. 822.)

V.  In a complaint for negligence the allegation that the defendant did the particular fact causing the damages will support all incidental facts and circumstances of omission and commission, and fairly tend to establish the negligence of the primary act.  (*Snyder* v. *Wheeling Elect. Co.*, 26 S. E. 733; Am. Dig. 189, part II, p. 4693 note g; *Madden* v. *Royal Port R. R. Co.*, 35 So. C. 381.)

VI.  The damages were not excessive, nor given under the influence of passion nor prejudice.  The testimony shows that plaintiff is a cripple for life; that he has suffered night and day from the injury received; that prior to the accident he was a good worker and nothing lazy about him; that now he cannot work, not even cut the kindling; that even yet he walks the floor nights unable to sleep from the pain in his hand and arm, and unable either to shut or to open his right hand, or to do scarcely any kind of manual labor, which is the only kind of labor he has ever done.  This is amply shown on every page of the testimony of plaintiff and his witnesses.  (Watson on Damages for Personal Injuries, p. 409, sec. 325.)

By the Court, TALBOT, J.:

In the complaint it is alleged in substance:  That the plaintiff was employed by the defendant to run a mower. On July 3, 1901, the defendant requested the plaintiff to work to the machine a horse which was unknown to him, which he had never seen before, and with the habits and disposition of which he was unacquainted.  "That said defendant then and there informed this plaintiff that said horse was a broken and gentle animal.  That said defendant then knew that said horse was neither broken nor gentle, but that he was a wild, dangerous, and uncontrollable animal, commonly known as a 'bronco.'  That plaintiff, while

so employed, and at defendant's request, commenced work-
ing said team, but without any fault on his part was unable
to work, manage, or control the same, and said team ran
away with said machine and this plaintiff, without any fault
on the part of plaintiff, throwing plaintiff therefrom violently,
and in such a manner that plaintiff was greatly, seriously and
permanently injured, his head and body hurt, his right leg
bruised and torn, and his right arm cut and broken, and
from which injuries plaintiff has, ever since suffered great
pain and anguish, his health has become broken and
impaired, and his right hand and arm permanently disabled,
to plaintiff's damage in the sum of ten thousand dollars."
The trial resulted in a verdict and judgment for $3,000 dam-
ages, and from an order denying defendant's motion for a
new trial he appeals.

The controlling question is whether the evidence is suf-
ficient to sustain the necessary allegations of the complaint
and support the verdict, and it becomes important to analyze
and compare the statement of the witnesses, and to ascertain
whether there is any testimony to sustain these material alle-
gations, or rather as many of them as are essential to make
the defendant liable in damages. Instead of bringing to this
court a full and cumbersome transcript of the evidence con-
taining much that has no bearing upon the points involved—
a practice that is quite common—the record in this case is to
be commended for giving a synopsis and close statement of
the effect of the testimony of the various witnesses. When
first called to the stand, the plaintiff stated that he was
employed in the latter part of June, 1901, by Mrs. Ander-
son, to help cut the defendant's grass; that he arrived at
defendant's ranch on Sunday evening, June 30th; that the
next morning he went to the corral about 4 o'clock, and
asked defendant if he would hook up his own team, and that
he said "No," that he had plenty of his own horses; that
plaintiff then said, "Say, Mr. Anderson, I won't drive any
broncos or bad horses, I am getting too old for that"; defend-
ant replied that his horses were all gentle, and that his "old
woman" could drive them; defendant gave plaintiff a good
gentle team that morning, which were slow, and which he
worked all that day—July 1st; that the next morning he

asked defendant if he would take his own team, which
defendant told him to use, and which he worked all day
Tuesday; that on the morning of July 3d plaintiff asked
defendant which team he would take, and defendant gave him
one of the horses that he had worked Monday and another
gentle horse, which he worked until noon; that after dinner he
took these two gentle horses he had worked in the forenoon,
and hooked them to the mower; that after he had them
hitched, and ready to start, Fred Scott, one of defendant's
men, brought him another horse already harnessed, and said
defendant wanted plaintiff to work him instead of one
already hooked to the mower, which was a very slow horse;
that defendant asked Scott if the horse was gentle, and he
replied that he did not know; that just then, and while they
were talking, the defendant and his son Ben and Arthur
Packard came along, and plaintiff asked defendant if the
horse was gentle, and he said "Oh, yes"; that the plaintiff
started to the meadow to mow grass; that when about 300
yards on the way the bronco looked back, bowed its neck,
kicked and bucked, and the team ran away; that he could
not hold them; that he was thrown to the ground, rendered
unconscious, had his right arm cut and broken, his leg
bruised, and sustained injuries from which he had ever
since suffered. Surgeons and others testified that both
bones of the right arm were broken above the wrist, and
that the muscles and hand were disabled. On plaintiff's
behalf there were also proof that, excepting the two years
previous to the trial, the plaintiff had teamed for sixteen
years, and was a skillful teamster; that defendant's horses
had the general reputation of being broncos, and mean;
and on cross-examination the plaintiff testified that the buck
skin horse which ran away with the mower was the worst he
ever saw; that no one could hold him; that he took the bit
in his teeth and pulled the old horse, the machine, and the
plaintiff, and bucked and kicked.

The defendant testified that when the plaintiff came with
his own horses to the defendant's ranch he (the defendant)
had horses of his own that he wanted to work to the mowers;
that the plaintiff worked his own horses a day or two, and
worked a team of defendant's in the forenoon on the 3d day

of July; that on that day the defendant told the plaintiff that he wanted him to work one of his young horses with an old horse to the machine; that they had been broken to work to the wagon, and were gentle; that the plaintiff could work one of his own horses with one of defendant's young horses, or take one of defendant's old horses with a young horse; the defendant had five teams and mowers cutting his grass; that on the 3d day of July he also told the other drivers to put a young horse with an old horse to each machine, and they did so; that the team hitched up for the plaintiff was a young horse and an old horse; that when the plaintiff started the team the young horse stopped and held back, and the defendant went up to the team and said to the plaintiff that the horse was gentle, but if he was afraid to drive the team the defendant's son Ben or Packard would drive it; that his son Ben and Packard were present, and his son Ben said to the plaintiff that he would drive, or that Packard would drive, and his son offered to drive, and that the plaintiff said that he would drive them himself, and he started off with them, and had gone about 300 yards when defendant's attention was attracted by the plaintiff yelling; that the team ran back to the barnyard, where they stopped. The defendant also testified that the horse had been broken to work to the wagon at Golconda in the spring before; that it had been worked to the wagon for two weeks before the 3d day of July; that it was worked right along to a wagon on the ranch, after the accident, the same as his other horses, and that he never knew or heard that it tried to run away, or that it was wild or dangerous, either before or after the accident. On cross-examination the defendant testified: "That horse was never hitched to a mower before the time plaintiff tried to drive him. Neither my son, nor Packard, nor any one else tried to drive him to a mower that season after plaintiff was hurt. The reason was because there was no more hay to cut. It was not because he was not gentle. I don't know whether I told Roberti that my 'old woman' could drive him or not, but I have a thousand dollars to bet right now that she can drive him. I won't bet that she can drive him to a mowing machine, but I will bet she can drive him. We have never worked that

horse in a mowing machine, but we have worked him in a wagon. When I saw the team running away, after Roberti fell off the machine, the boys and I ran toward the team to stop them. I did not want my machine all broken up, and after we stopped the team near the corral we went to where Roberti was lying."

The defendant was corroborated largely by the witness Packard and by his son Ben Anderson. The latter testified in part: That when plaintiff took the lines and his seat on the mower the horses started off all right, but the plaintiff pulled on the lines so hard that the young horse, having a tender mouth, stopped; that the old horse continued to pull, and a tug came loose; that the defendant then came up, and told the plaintiff that if he was afraid of the horse the defendant's son Ben would drive him; that the horse was gentle working to a wagon; that witness then said to the plaintiff that he or Packard would drive the team, and witness offered to do so, and the plaintiff said in reply that he would drive them himself; that he started, and when he had gone a few hundred yards he heard the plaintiff yelling, and saw the team come running back to the yard; that every year defendant had some young horses broken to the mower after they had became gentle in working to the wagon. He also testified that the horse was afterwards worked in a wagon and in a machine, and has never since shown a disposition to buck or run away. On cross-examination the witness stated: "I helped break the buckskin to a wagon in February at Golconda. I never drove him to anything but a wagon. He was a big, strong, full-grown animal. We were working five mowers that day. This buckskin and gray were the only two horses left that had not been worked to the mowers. I told Roberti myself that the horse was gentle. I did so because he was so, and we wanted to get him broke to a machine." Packard testified that the buckskin horse had long legs, was fifteen or sixteen hands high, was a good runner, and may have been seven or eight years old.

Defendant's daughter testified that at the breakfast table on the 1st day of July she heard her father tell the men that he wanted them to work one of his young horses with an old horse in order to break them to the mower, and she said

that she did not think at the time of the trial that the plaintiff was much hurt.

In rebuttal the plaintiff testified that the defendant did not tell him that his son Ben or Packard would drive the team; that the son Ben did not offer to drive them, nor say that he or Packard would drive them; and that he told the defendant that he would not drive broncos; that nothing was said about the horse by the defendant, nor by defendant's son Ben, nor by Packard, in the hearing of the plaintiff, except that the defendant said the horse was gentle, and that his "old woman" could drive him.

It may be observed that the most essential parts of plaintiff's testimony are contrary to that given by witnesses for the defendant. The record indicates that Ben Anderson stated that the horse was worked to a mower after the accident, and has never since shown any disposition to buck or run away, in conflict with the assertion of his father that he had not been so worked since; and the testimony of defendant's daughter that she did not think at the time of the trial that the plaintiff had been seriously hurt may be considered in connection with that of the physicians and others, who testified regarding the broken arm, cut muscles, permanently disabled hand, and the nature of the injuries plaintiff sustained. In giving due consideration to the statements of the defendant and witnesses for him that the horse was gentle, we must not forget that the plaintiff, who without contradiction was shown to be an experienced teamster, testified that the horse was the worst he ever saw, and that another witness stated that defendant's horses had the general reputation of being a mean, bad lot. This court has repeatedly held that in case of conflict it will not set aside the verdict if there is any substantial evidence to support it, and the testimony of a larger number of witnesses to a different state of facts is no ground for reversal. (*State* v. *Buralli*, 27 Nev. 41, 71 Pac. 537.) It is also the well-established rule that questions relating to the weight of the evidence are for the trial court, which has opportunities for observing the bearing and demeanor of the witnesses, and is better able to judge regarding the force and effect which should be given to their testimony, and the order of the district judge granting or

refusing a motion for a new trial on that ground will be sustained. (*Golden* v. *Murphy*, 27 Nev. 379, 75 Pac. 625, and cases there cited.)

It must be conceded that the duty of this court in the case at bar is, not to determine between the opposing statements of witnesses, but to ascertain whether there is sufficient evidence to support the verdict and judgment. If all testimony in conflict with that favorable to the plaintiff be ignored, applying these ordinary legal principles, and the further doctrine that the plaintiff assumed the risks incidental to the employment which he knowingly accepted, and for a consideration (his wages) agreed to pursue, we should consider carefully the work he was willing to undertake, and whether the statement of the defendant led him into dangers which he sought to avoid. The fact that the defendant said to the men at the breakfast table on July 1st, or at another time or place, that he wished them to drive young horses with old ones to the mower, did not make it incumbent upon the plaintiff to do so. Although the other men were willing to chance the dangers which might follow, and consequently would be unable to recover for injuries resulting, the plaintiff was quite at liberty to decline to assume these risks; and according to his own testimony this he evidently and by due care endeavored to do. He stated that he told the defendant that he would not drive any broncos or bad horses; that he offered to work his own team; that the defendant told him the horse was gentle; and he denies that the defendant or his son Ben offered to have the latter or Packard drive, or that he was told anything regarding the horse except that he was gentle, and that defendant's old woman could drive him.

Under the legal assumption, binding on this court, as indicated, that the jury relied upon plaintiff's testimony, and considering the undisputed circumstances that after dinner on the fatal day the plaintiff hitched to the machine the gentle team which he had worked in the forenoon, and that when they brought him the buskskin horse in place of a slow one he asked if it was gentle, that he had previously told defendant that he would not work any broncos or bad horses, a fair construction of plaintiff's testimony would have warranted the jury in concluding that plaintiff had no previous

knowledge regarding this horse; that he did not know whether he had been worked to a mower; and that by defendant's assurance that he was gentle, and that his "old woman" could drive him he was induced to start with him, and was led into the accident which followed, and into the very danger which he had notified defendant he wished to avoid. The defendant's recommendation of the horse, under the plaintiff's testimony, would naturally apply to the work in hand, and was broad enough to include its gentleness when worked to a mower. Defendant's statements had the tendency to induce the belief that all his horses were gentle, and that this one was safe for a woman to drive.

Against this the plaintiff introduced evidence tending to show that defendant's horses had the general reputation of being a mean, bad lot, and testified that the buckskin was the worst he ever saw. The defendant, and other witnesses for him, stated that this horse had been broken to work to the wagon in the previous February or March; that he had been driven from Golconda to the ranch with a band of horses, and worked in a wagon there two weeks before the accident; and that at no other time since he was broken has he shown any disposition to run away, buck, or kick. Admitting this to be true, still the defendant, as a rancher experienced with such animals, must have been aware that a horse which was not broken until he was seven or eight years old, and then late in the winter, when he was likely to be in poor flesh and spirit, would, if taken up in June or July, when the grass is good, and he is fat, be liable to cause trouble when hitched to a mowing machine for the first time, instead of being gentle enough for a woman to drive.

The facts within the knowledge of the defendant and unknown to the plaintiff would hardly warrant such an assurance of extreme gentleness—one which would be likely to induce a timid man or woman to drive him. It is apparent that the plaintiff wished to avoid danger, and that the defendant's remark, as testified to by the plaintiff, which gave the horse a higher recommendation than the circumstances known to the defendant justified, led plaintiff to assume the risk which resulted in his injuries. After a review of the pleadings and evidence, we are not prepared

to say that the action is based upon fraud or negligence. The most important allegations in the complaint are that the horse was dangerous, and that the defendant knew that he was so at the time he recommended him to be gentle. Every man is presumed to know what he ought to know, and the defendant, from his experience, as a rancher, with horses, and from what he knew regarding the age and slight breaking of this one, may be charged with knowledge of the fact that there was danger in working him the first time to a mower. True, he states that he told the plaintiff the horse was gentle to a wagon, and that he wanted him to break him to a mower, but this the plaintiff denies. Whether the latter or the defendant and his son and hired man were right in this regard was a question for the jury, and not for this court, to determine. If the statements were made by defendant as testified by his witnesses, we do not think it probable that the plaintiff failed to hear them. The proximity of the parties, and the testimony of the defendant's witnesses that plaintiff made reply, indicate that he heard what is claimed to have been stated to him regarding the horse, if the remarks were made at all; and his denial raised a conflict in that part of the evidence.

The judgment and order of the district court denying the motion for a new trial are affirmed, with costs in favor of respondent.

BELKNAP, C. J.:   I concur.

FITZGERALD, J., dissenting:

The allegations of the complaint are as follows:   "That heretofore, to wit, on or about the 3d day of July, A. D. 1901, plaintiff was employed by said defendant in cutting defendant's hay on the ranch of defendant in said [Humboldt] county with a machine commonly known as a mower or mowing machine. That while so employed as aforesaid on said 3d day of July said defendant requested this plaintiff to work a certain team of defendant's horses on said mower. That one of said horses was unknown to this plaintiff, who was not acquainted with the habits nor disposition of said horse, never having driven or worked, nor seen said horse driven or worked, prior to that time. That said defendant then and

there informed this plaintiff that said horse was a broken and gentle animal. That said defendant then knew that said horse was neither broken nor gentle, but that he was a wild, dangerous, and uncontrollable animal commonly known as a 'bronco.' That plaintiff, while so employed as aforesaid, and at defendant's request, commenced working said team, but, without any fault on his part, was unable to work, manage or control same, and said team ran away with said machine and this plaintiff, without any fault on the part of plaintiff, throwing plaintiff therefrom violently and in such manner that plaintiff was greatly, seriously, and permanently injured," etc. This is an action of damages against the defendant for the injuries that the plaintiff received as he alleges in the above complaint.

If the complaint be considered in the nature of a willful and malicious misrepresentation and fraud under the allegation "that said defendant then and there informed this plaintiff that said horse was a broken and gentle animal; that said defendant then knew that said horse was neither broken nor gentle, but he was a wild, dangerous, and uncontrollable animal commonly known as a bronco"—then I think the evidence does not support the allegation; for there is nothing therein to show that the defendant knew that the horse was "a wild, dangerous, and uncontrollable animal commonly known as a bronco." Could the complaint be considered as an action of damages for negligence on the part of the defendant under the relations of master and servant between defendant and plaintiff? It would seem not. (*The Indiana B. & W. R. Co.* v. *Burdge*, 94 Ind. 46; Shearman & Redfield on Negligence, sec. 20, and note; and Labatt's Master and Servant, sec. 59, and note 4.)

Does the evidence given on the trial support the verdict of the jury in favor of plaintiff? While there is some conflict in the evidence on other points, to me it seems, though otherwise to my Brethren, that the uncontradicted evidence is as follows: Plaintiff hired to defendant to work for defendant in running defendant's mower in mowing hay on defendant's ranch. Plaintiff was an experienced teamster, and had before broken horses for a man by the name of Snapp, and plaintiff himself owned and worked bad horses. Defendant

told plaintiff that he wished him to work to a mower a horse of defendant's that had not been broken to work to the mower, but had been broken to work to a wagon, and that the horse was broken and gentle in working to a wagon; that defendant wanted plaintiff to work said horse with an old and gentle horse, so as to break the unbroken horse to work to a mower. An old horse and the young and unbroken horse were hitched to a mower, and plaintiff mounted the mower and started to drive the team. The young horse stopped. The other horse then stopped also. A tug came loose and was fixed, the team started again, and the young horse ran away, taking with him the other horse and mower. The plaintiff was violently thrown to the ground and greatly injured. On the foregoing the testimony is, as it seems to me, uncontradicted, for I think the rebuttal testimony of plaintiff does not extend to a contradiction of the defendant and his son Ben as to conversations had by them with plaintiff prior to the time of the accident, to wit, about noon of July 3d. My Brethren think otherwise, and, should the truth be as they think, yet it seems to me that, before a brand of such legal and moral obliquity as would inevitably fall upon the defendant should he be held to have knowingly, willfully, and wantonly placed a human being in a position where the most probable result would be death or great bodily harm to him, the evidence of it should be clear and unequivocal.

It is always held that fraud should be clearly proved. To place a human being in a position where he might meet death or great bodily harm is certainly equal to fraud in civil transaction, for fraud would only take from a person property; but willfully to do the thing just mentioned would most probably deprive him of life or limb. The proof of the latter should certainly measure up to the full requirement of the proof for fraud in civil transactions. The contradictions of the conversations that the defendant and his son Ben said that they had with plaintiff prior to the noon of July 3d should have been specific, and not merely general; for in those conversations defendant and his son Ben distinctly state that they informed the plaintiff that the horse that did the mischief was gentle, and broken to work to a wagon, but

had not been broken to work to a mower, and that the
defendant wanted plaintiff to hitch him with an old horse to
work him to the mower.   The result of such a denial, and
the jury and court so holding, would be so serious to defend-
ant—so nearly resembling, or perhaps equaling or surpassing,
fraud—that the proof of it should, like the proof of fraud,
be clear.   The result of holding the allegations of the com-
plaint thus proved would put the defendant in the position
of knowingly and deliberately laying a trap for the plaintiff;
lulling all suspicions of the plaintiff to rest, and tolling him
into a position in which plaintiff would most probably lose
his life or receive great bodily harm.   In the case at bar the
plaintiff did actually receive great and lasting injury.  Surely
no human being should be thus branded unless the question
of his guilt be fairly presented to court and jury, and the
facts warranting it clearly and distinctly proved.   This, it
seems to me, has not been done in this case.

On the following there is contradiction:   Defendant's son
Ben and a man by the name of Packard testify that when
the team stopped after the first starting about noon on July
3d defendant came up and told plaintiff that if plaintiff was
afraid to drive the team defendant's son Ben or Packard
would drive it, and also defendant's son Ben told plaintiff
the same thing, and that plaintiff replied, "No, I will drive
the team myself"; Packard and Ben adding in their testi-
mony that plaintiff also said, "I have broken horses for
Snapp."   Plaintiff, in rebuttal, denied that either defendant
or defendant's son Ben told plaintiff that Ben or Packard
would drive the team.   Plaintiff, however, did not deny that
he at the time said, "No, I will drive the team myself; I have
broken horses for Snapp."

Such being the testimony, on an analysis of it what should
be the result?  First.   Let us consider the testimony up to
the moment the team stopped and the defendant came up.
Wherein, up to that time, was defendant either false in his
statements to plaintiff or negligent in his statements or acts?
Second.   Suppose at the time defendant came up to the
stopped team that neither defendant nor his son Ben told
plaintiff that defendant's son Ben or Packard would drive
the team, would this omission have rendered the defendant

negligent? In the light of what, according to the testimony above stated, defendant had previously told plaintiff, as the uncontradicted testimony shows, it would seem that the defendant would not have been negligent. This position is strengthened by the fact that under the general rule courts and juries are not unnecessarily to find witnesses perjured, but must reconcile testimony, if it can reasonably be done. Under said rule there is, perhaps, no necessity to find that either defendant and his son Ben and Packard committed perjury when they swore that defendant and his son Ben told plaintiff that the said son or Packard would drive the team, or that the plaintiff committed perjury when he said that they did not so tell him; for it is quite possible that the defendant and his son Ben did on the occasion say what the three witnesses said that they said; and it is also quite possible that the plaintiff did not hear them say it. If they said it, and plaintiff did not hear it, at that time, there was at that time nothing negligent on the part of defendant; and, if nothing of the kind whatever occurred, still, under the uncontradicted testimony as it appears to me in the record on appeal here, I cannot see wherein defendant was negligent or in default. It would seem that under the facts stated in the uncontradicted testimony neither defendant nor plaintiff could have anticipated that the horse would run away; that defendant had no more reason to think so than the plaintiff had; that plaintiff's opportunities for knowledge on the subject were equal to those of defendant; that the unfortunate accident that caused the melancholy result of injury to the plaintiff was one of the ordinary risks of plaintiff's employment; and that while all should, and doubtless do, much regret it, defendant cannot legally be mulcted in damages therefor.

Perhaps it may be proper to state that I have not overlooked the fact that the plaintiff testified that he told the defendant he would not "drive broncos or bad horses; that he was getting too old for that"; and also that plaintiff testified that the defendant told him that the horse was gentle, and that defendant's "old woman" could drive him. The first statement does not, in the light of the uncontradicted testimony, materially alter the case; and the second state-

ment must have meant, and plaintiff must have understood that it meant, that the horse was gentle in working to a wagon, and that the defendant's wife could drive the horse to a wagon.

For the foregoing reasons I think the order of the trial court denying a new trial should be reversed; that a new trial should be granted; and that the plaintiff should, if he so desires, have the privilege of amending his complaint so as to make his cause of action be one sounding in negligence, and not one sounding in knowing, willful, and wanton and reckless injury, and perhaps even fraud. But should the plaintiff still think that the facts of the case justify him in alleging his cause of action as one sounding in knowing, willful, wanton, and reckless injury, and perhaps fraud, he should, on a retrial thereof, be held to make clear proof that it is such.

It may perhaps be proper to remark here that should the complaint be one sounding in willful, knowing, and deliberate wrong and injury, such as is sometimes called "laying a trap" for plaintiff, then some decisions go to the extent that neither "assumptions of risks" nor "contributory negligence" on the part of plaintiff could, by the defendant, be pleaded in bar of the action.